**Dr. Beatriz ROSADO, Plaintiff,**

v.

**VIRGINIA COMMONWEALTH UNIVERSITY, Defendant.**

**Civil Action No. 3:95cv749.**

United States District Court, E.D. Virginia, Richmond Division.

May 29, 1996.

Debra D. Corcoran, Richmond, Virginia, for Plaintiff.

Pamela F. Boston, Special Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, David L. Ross, Jean F. Reed, Virginia Commonwealth University, Richmond, Virginia, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

After Dr. Beatriz Rosado was denied promotion and tenure by Virginia Commonwealth University ("VCU"), she filed this action alleging that VCU had violated her civil rights as protected by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, when it rejected her application for promotion and tenure on account of her gender and national origin. For the reasons set forth below, the court concludes that the record does not support that theory and that VCU is entitled to summary judgment.

### STATEMENT OF FACTS

Rosado, a Puerto Rican woman, was hired by VCU in 1988 as an Assistant Professor of Spanish, a tenure-eligible position in the Department of Foreign Languages, in VCU's College of Humanities and Sciences. Under VCU's tenure system, the probationary employment period, during which the performance of tenure-eligible faculty members is evaluated, is seven years. *See* Def.Ex. 34D. A formal tenure review and evaluation process occurs during the sixth year of the probationary period so that faculty members with favorable reviews are granted tenure in the seventh year and those with unfavorable reviews are employed for an additional year under a terminal contract of employment. *Id.*

Rosado's probationary period at VCU began when she was hired in August 1988 and ended in September 1993 when she tendered her application for tenure and promotion to Associate Professor. Once a candidate applies for promotion to the tenured position of Associate Professor, VCU employs an elaborate multi-step process, which is intended to provide a series of checks and balances so that no single aspect of the process will unduly affect the tenure decision either for or against the candidate. That process was followed here. Before recounting the details of the review process as it was applied to Rosado, it is necessary to summarize the criteria which govern the consideration of promotion and tenure applications at VCU.

### I. The Controlling Criteria

The controlling criteria are set forth in several documents. First, there is VCU's Faculty Promotion And Tenure Policies And Procedures ("VCU Policy"). In defining the goals of the process, the VCU Policy instructs in general that:

[P]romotion and/or tenure should be based on the merit of the individual, consideration of comparable achievement in the faculty member's particular field, his or her value to the University and the discipline, and the needs and resources of the University. Promotion in rank reflects the quality of performance in appropriate teaching, research, and service.

*See* Def.Ex. 34A. The VCU Policy articulates the following specific criteria for promotion and tenure:

IV. **Promotion And Tenure Criteria**

A. General Minimum Criteria

The following *criteria* will *apply* in the evaluation of *all* tenure-eligible or tenured faculty for promotion and/or tenure.

1. Appropriate credentials and experience
2. Demonstrated quality in teaching
3. Continuing scholarship and professional growth
4. Performance of service and responsibilities to the University, school, department, profession, and broader community
5. Appropriate personal qualities

\* \* \* \* \* \*

C. Basic Criteria For Promotion

\* \* \* \* \* \*

[P]romotion to *associate professor* shall indicate a sustained record of professional achievement....

*See* Def.Ex. 34E, F (emphasis added).

In addition to the criteria established in the VCU Policy, each college within VCU is permitted to amplify the VCU Policy by adopting "school guidelines," which may include "[a]dditional special criteria unique to a given school," and an applicant's rating under

the school criteria "shall be ... excellent, very good, satisfactory, or unsatisfactory." *Id.* Because Rosado taught in VCU's College of Humanities and Sciences, the VCU Policy is augmented by the Promotion And Tenure Guidelines For The College of Humanities And Sciences ("College Promotion and Tenure Guidelines"). *See* Def.Ex. 35. Those guidelines "emphasize the commitment of the college to excellence in teaching, research and service, ... and conform with the university guidelines, adding to them where appropriate ..." *Id.* The guidelines also explain that "[s]trong emphasis is placed on *teaching* and *research/scholarly activities* ... [and that] [g]enerally the measure in scholarship is recognition by one's colleagues in the profession, and this document delineates means for evaluating this recognition." *Id.* (emphasis in original). The College Promotion and Tenure Guidelines also contain specific criteria for promotion and tenure:

> **Criteria**
>
> The performance of each candidate will be evaluated in terms of the following criteria. The candidate must be satisfactory in each of the three areas of teaching, research and service, *but should show great strength in at least teaching or research.*

*See* Def.Ex. 35F (emphasis added). For associate professorship, the criteria imposes an additional requirement by specifying that:

> [P]romotion to *associate professor* requires a clear pattern of accomplishment, particularly in the areas of teaching *and* research, which indicates *progress toward a national reputation.*

*Id.* (emphasis added). Subsection B of the Criteria further provides:

> B. Research and Scholarly Activities
>
> All faculty should be continuously and productively engaged in research and scholarly activity. Such activity should make a substantive contribution and reflect high standards of quality in creativity, scholarship and professional competence. The quality and significance of research and scholarly activity will be affirmed by peer evaluations and letters of critique from experts, particularly those outside of the university.

*See* Def.Ex. 35H.' This section of the Criteria recognizes that there is substantial variation in the assessment of individual faculty member contributions, but specifies that "[n]evertheless, there are several general criteria for evaluating research and scholarly activity." *Id.* Of such considerations, "[t]he *primary criteria* will be *research and scholarly productivity as measured by* quality and quantity of articles, monographs and/or books. Candidates may also submit completed but as yet unpublished materials for the evaluation." *See* Def.Ex. 35I (emphasis added).

Taken together, the VCU Policy and the College Promotion and Tenure Guidelines require continuing scholarship and professional growth as minimum prerequisites to obtaining promotion and tenure. The VCU Policy requires that a "sustained record of professional achievement" is a prerequisite to promotion to Associate Professor. *See* Def.Ex. 34F. The College Promotion and Tenure Guidelines additionally require that a candidate for promotion to that position must demonstrate "a clear pattern of accomplishment, particularly in the areas of teaching and research, which indicates progress toward a national reputation." *See* Def.Ex. 35F.[1] The College Guidelines also emphasize that the primary requirement is productivity in research and scholarly activities as measured by actual publication, although they permit consideration of completed but as of yet unpublished works. *See* Def.Ex. 35I.

## II. Rosado's Annual Evaluations During The Probationary Period

With these criteria in mind, it will be helpful to review Rosado's performance during

---

**1.** In this action and before the Appeal Panel, Rosado emphasized the following language as controlling: "[t]he candidate must be satisfactory in each of the three areas of teaching, research and service, but should show great strength in at least teaching *or* research." *See* Def.Ex. 35F. This language applies to all promotions and tenure candidates, whereas the next paragraph applies specifically to promotion to the position of Associate Professor. That paragraph requires "a clear pattern of accomplishment, particularly in the areas of teaching *and* research, which indicates progress toward a national reputation." *Id.* (emphasis added).

her period of probation before examining the record of the promotion and tenure process.[2]

On May 2, 1988, when Rosado was offered a tenure-track position as Assistant Professor of Spanish in the Department of Foreign Languages in the College of Humanities and Sciences, her attention was directed to the requirements for tenure and promotion discussed above. *See* Def.Exs. 1, 2. As is customary, Rosado received annual faculty reviews during her probationary period. Her first review was for the period 1988–89 and showed that Rosado "performed well during her first year" and that "I fully expect that she will develop a creditable research record during the coming years." *See* Def. Ex. 3. Her second review, for 1989–90, noted that "*Dr. Rosado continues to progress with her research and now needs to work towards publication.*" *See* Def.Ex. 4 (emphasis added). Her third review, for 1990–91, observed that:

> Dr. Rosado has performed well during the year, especially in teaching and service. I *trust that her publication record will be strengthened* as a result of the research she has been conducting.

*See* Def.Ex. 6 (emphasis added).

Also during the third year, Rosado received a so-called "mini review," which is a precursor to the full-scale review for promotion and tenure at the end of the probationary period. *See* Def.Ex. 5. That review was conducted by the Department Chairman and two members of the Department. In a memorandum accompanying that review, the Department Chair alerted Rosado that the report "cites several areas that you will need to pay special attention to in preparation for your subsequent review for tenure and promotion." *See* Def.Ex. 7. Rosado participated in the mini-review and, according to the Department Chairman, "[f]rom your comments on the report made during our meeting, I believe we are all in basic agreement on what needs to be done to present a strong case for tenure and promotion." *Id.* He concluded with the comment that:

The area of *research publication*, as opposed to research and scholarly activity, *is one area you need to focus on.* As we discussed, you have a large amount of work presently completed and in progress and now need to ensure that this material appears in print.

As we are all aware, this *area is one which carries much weight in tenure and promotion decisions.* Based on our conversations, I am confident that *you have a clear understanding of what needs to be done.*

*See* Def.Ex. 7A (emphasis added). The actual mini-review also warned that "[b]y the time Dr. Rosado is considered for tenure, *she will need to bring her work to fruition, to be able to present published work to the review committees* of the department, college and university." *See* Def.Ex. 7F (emphasis added).

Rosado's fourth faculty review, for 1991–92, reflected the following:

> Dr. Rosado has been working on a number of different projects during the past year. Several works have been submitted for review and several others are in preparation. She participated in a summer workshop at VCU last summer and also received a faculty grant-in-aid to revise a manuscript. *It is imperative that she continue aggressively with her research and scholarly program as she approaches her tenure/promotion review.*

*See* Def.Ex. 8 (emphasis added). In that review, Rosado was encouraged to concentrate "on her scholarly work during the upcoming year." *Id.* Rosado's fifth and final annual review in 1992–93 observed that she had presented a paper at Cornell University and that she "has been particularly productive in her own creative writing, both in poetry and in prose." *See* Def.Ex. 9.

Rosado submitted her application for tenure and promotion to Associate Professor in the Fall of 1993. In perspective of this history and the controlling evaluation criteria, it is appropriate now to review the process during which Rosado's application was measured and rejected.

---

**2.** This review and the balance of the opinion will focus on the issue of research and scholarship because that is the focus of this action, there being no question about Rosado's satisfaction of the teaching and service criteria.

## III. The Promotion And Tenure Decision

### A. *The Departmental Peer Review Committee And The Department Chair*

The first stage of the formal review process is conducted by the Peer Review Committee, which is composed of tenured faculty in the candidate's department and selected other faculty and staff. The candidate is entitled to challenge any member of the Peer Review Committee. In Rosado's case, the Chair of the Foreign Languages Department, Dr. Robert Godwin–Jones, appointed a Peer Review Committee consisting of three white males and two white females, none of whom Rosado challenged when afforded the opportunity to do so.

With input from the candidate, the Peer Review Committee solicits persons in the candidate's field at other colleges and universities to serve as "outside reviewers." These reviewers evaluate the candidate's work and submit written reports for consideration by the Peer Review Committee. Rosado submitted the names of three outside reviewers, who, along with six others suggested by the Peer Review Committee, were selected to comprise the panel of outside reviewers who would review and report on Rosado's printed works. Rosado registered no objections to any of the nine selected reviewers. Eight of the nine reviewers ultimately accepted the appointment to review Rosado's works.[3]

The assessment of Rosado's work by the outside reviewers was mixed. One reviewer was unquestionably negative and the others ranged from lukewarm to positive. Upon consideration of the reports from the outside reviewers, the Committee's own evaluation of Rosado's works, the voluminous materials submitted by Rosado, and input from the faculty, the Peer Review Committee rated Rosado's teaching as "excellent," her service as "excellent," and her research as "satisfactory," and recommended Rosado for tenure and promotion. *See* Def.Ex. 16.

The report of the Peer Review Committee acknowledged that the primary criteria in tenure and promotion decisions is "research and scholarly productivity as measured by quality and quantity" of the candidate's published works. *See* Def.Ex. 16H. It then cataloged and discussed Rosado's research, her efforts to publish, and the comments of the outside reviewers and concluded that: (1) "[i]n accordance with the College guidelines, Dr. Rosado has thus been and is 'continuously and productively engaged in research and scholarly activity,'" *see* Def.Ex. 16J; and (2) "the material under review clearly evidences a commitment to excellence in literary research and the possibility of even greater contributions in the field of creative writing." *See* Def.Ex. 16S. The report also observed that Rosado's scholarship "is a constantly evolving process whose developmental and publication phases do not necessarily adhere to those of traditional literary scholarship." *See* Def.Ex. 16U. This and the mixed comments of the outside reviewers led the Peer Review Committee to observe: "[t]hat much of her research and creative writing are appearing now [rather than during the probationary period] indicates the culmination of this process [Rosado's non-traditional concept of academic research] rather than inconsistency or lack of commitment to scholarship." *See* Def.Ex. 16V.

In general, the Peer Review Committee appears to have avoided measurement of Rosado's research and scholarship on the basis of the quality and quantity of her published works. Nowhere does the Peer Review Committee find in Rosado's works, as required by the College Guidelines, "a clear pattern of accomplishment, particularly in the areas of ... research, which indicates progress toward a national reputation." Instead, the report reflects critiques of, and comments about, Rosado's works as well as lengthy and largely laudatory remarks which represent an effort to make a case for Rosado apart from the controlling criteria respecting research and scholarship.

The next stage of the review process was conducted by the Department Chair, God-

---

**3.** One reviewer, Dr. George Aguilar Mora, Professor of Spanish at the University of Maryland, asked that his name be removed from the panel of outside reviewers because he disagreed with Rosado's inclusion of her own unpublished material in an article which she had submitted for publication.

win–Jones, who provided review from an administrative level and evaluated the candidate from the perspective of the Department as a whole, taking into account the contribution made by the candidate. Godwin–Jones rated Rosado "excellent" in teaching, "very good" in service, and "satisfactory" in research, and recommended that she be granted promotion and tenure. *See* Def.Ex. 17.

Like the report of the Peer Review Committee, the submission of Godwin–Jones was devoid of any reference to the criteria which control the award of tenure and the promotion to Associate Professor. Instead, Godwin–Jones observed:

- Dr. Rosado has not as yet published a great deal in this area [her primary field], but she has been continually active in the field through the numerous conference papers she has delivered.
- Dr. Rosado does not have a large body of published scholarship and this is a concern to me as it was to the [Peer Review] Committee. At the same time, I recognize that creative works [an emphasis adopted by Rosado near the end of her probationary period] typically necessitate a longer time to come to fruition.

*See* Def.Ex. 17B. Then, for reasons neither disclosed nor readily apparent, Godwin–Jones stated: "[i]n the area of research, I rate Dr. Rosado as 'satisfactory.'" *Id.*

In sum, neither the Peer Review Committee nor the Department Chair appear to have based their recommendations on the controlling criteria set forth in the College Guidelines or the VCU Policy.

### B. *The College Committee*

The next stage of the tenure review process occurs at the college level and is undertaken by an elected committee of faculty members representing each of the major divisions of the college. In Rosado's case, this committee was the College of Humanities and Sciences Promotion and Tenure Advisory Committee ("College Committee"). Its task was to evaluate candidates in terms of overall university, college, and departmental standards and the mission of the college as a whole. Unlike the Peer Review Committee, the College Committee assessed all tenure candidates from all colleges in relation to one another. Rosado's College Committee was comprised of three white males, one Iranian male, two white females, and one Italian female. After reviewing the recommendation of the Peer Review Committee, the Department Chair, the outside reviews, and all the material submitted by Rosado, the College Committee determined that Rosado's teaching was "excellent," her service was "very good," but that her research was "unsatisfactory." Consequently, by a vote of 5 to 1, the College Committee recommended denying promotion and tenure, finding that Rosado failed to meet the controlling tenure and promotion criteria. *See* Def.Ex. 18D.

In stark contrast to the action taken by the Peer Review Committee and the Department Chair, the College Committee's findings were specifically tethered to the controlling guidelines.

The Criteria for promotion to associate professor in the 'Promotion and Tenure Guidelines for the College of Humanities and Sciences' stipulate 'great strength in at least teaching or research,' and this committee concurs with the Peer Committee and the Chairman in finding great strength in the area of teaching. *The 'Guidelines' of the College also require 'a clear pattern of accomplishment ... which indicates progress towards a national reputation.'* This committee carefully considered the outside reviewers' comments and the record of publication; concern was expressed about the lack of work actually published, rather than in press or submitted. With regard to Dr. Rosado's work as a literary critic, the record of publication, the mixed comments by the outside reviewers, and the candidate's redirection towards creative writing do not indicate to the committee that the criteria above have been met. As a writer of fiction and poetry, the candidate shows more promise, as demonstrated by the outside reviewers' comments, *but in the judgment of the majority of the committee the materials considered do not demonstrate the 'clear pattern of accomplishment' and 'progress towards a national*

*reputation' as stipulated by the 'Guidelines.' On the basis of the criteria considered above, this committee voted as follows* on whether or not to recommend Dr. Rosado for tenure and promotion to associate professor:

(Note: the Committee member from the Candidate's Department abstained on all votes.)

For tenure and promotion to associate professor 1 .

Against tenure and promotion to associate professor 5 .

*See* Def.Ex. 18D (emphasis added).

The College Committee submitted its report to the Dean of the College of Humanities and Sciences, David R. Hiley, a white male, whose obligation was to assess the candidate from the perspective of the needs of the College as a whole. After reviewing all reports, evaluations, the tenure file, and the recommendations of the Peer Review Committee, the Department Chair, and the College Committee, Hiley concluded that Rosado's teaching was "excellent," her service was "very good," but that her research was "unsatisfactory." *See* Def.Ex. 21. He also recommended that Rosado not be promoted or given tenure. Hiley concluded that:

- In the *absence of a consistent pattern of research activity,* a candidate would have to present work of unusually high quality to justify a recommendation for tenure and promotion to associate professor. Given these very mixed external assessments of her manuscript in literary criticism, I am unable to conclude that the manuscript in press is of sufficient quality to override my concerns about her lack of consistent productivity.
- Every level of review notes that Dr. Rosado is stronger in the area of creative writing than literary criticism. However, the same issues arise here as with her manuscript in criticism. Her collection of short stories is in press, and, while the publication date was first indicated as November 1993, it has not appeared as of today. Again, outside reviewers' assessment of her short stories are mixed. . . . Given the lack of substantial creative writing in print, the ab-

sence of critical reviews that would support an assessment of the quality of the work, and the fact that creative writing is not the area of her training, the core of her teaching, or part of the expectations for which she was hired, *I conclude that she has not established a 'clear pattern of accomplishment . . . which indicates progress toward a national reputation.'*

- The Peer Committee report does an excellent job of detailing and documenting Dr. Rosado's teaching accomplishments, and I concur that the record shows she is an excellent teacher. Further, I agree with her department Chair and the College Tenure and Promotion Committee that her service to the University has been very good. I take her accomplishments in these areas very seriously. I especially prize the excellence of her teaching. However, *the requirements for tenure and promotion are clear in articulating our expectation that faculty for whom we wish to make so long-term a commitment as tenure* implies must demonstrate a *consistent and serious commitment* to *each* of the three roles of a faculty member. Dr. Rosado *has had adequate time and appropriate counsel* from her department chairs and her third-year review to establish her credentials in her scholarly work. In my judgment, she *has not at this point established those credentials.*

*See* Def.Ex. 21B (emphasis added).

At this point in VCU's review process, a tenure candidate is afforded the opportunity to examine all recommendations and reports submitted at each level of the review. The candidate is permitted to submit a written response to any perceived errors in the findings and recommendations. Hiley met with Rosado to review her tenure candidacy, and, on January 11, 1994, she submitted a written statement of corrections for consideration throughout the remainder of the review process. *See* Def.Ex. 22.

Hiley forwarded Rosado's statement and the entire file respecting Rosado's candidacy to the Provost and Vice–President of Aca-

demic Affairs, Grace Harris, a black female. On February 3, 1994, Harris recommended promotion and tenure for Rosado because Rosado was uniformly viewed as an excellent teacher and because "[t]wo major goals of the University for our faculty are diversity of cultures and excellent teaching." *See* Def. Ex. 23.[4]

### C. *The University Committee*

Rosado's file then was presented to the University Promotion and Tenure Committee ("University Committee"), which was comprised of nine tenured faculty members representing the schools and colleges on both campuses of VCU. Rosado's University Committee consisted of six white males, two white females, and one black female. After reciting the requirements of the College Promotion and Tenure Guidelines, the University Committee remarked that "[a]lthough she has established a clear pattern of accomplishment in teaching, there is concern about the lack of a clear pattern of accomplishment in scholarly activity." *See* Def.Ex. 24. On March 29, 1994, the University Committee recommended that Rosado be denied tenure and promotion because she failed to "establish[ ] a clear pattern of accomplishment in professional achievements." *See* Def.Ex. 24A.

Under VCU's procedure, a candidate who is not recommended for tenure by the University Committee is given written notice of that determination and afforded the opportunity to appeal the recommendation to the University Promotion and Tenure Appeal Panel ("Appeal Panel"). Rosado was so advised on April 6, 1994 and duly noted an appeal on April 14, 1994. *See* Def.Exs. 25, 26.

### D. *The Appeal Panel*

The Appeal Panel, consisting of three white males, three white females, and one Indian female, reviewed Rosado's tenure file on May 17, 1994. At the hearing, Rosado

was permitted to make a lengthy statement to the Appeal Panel and to invite five people to speak on her behalf. Rosado also was allowed to submit an updated curriculum vitae and to tender any works which had been accepted for publication or published since the submission of her initial application for tenure in September 1993.[5]

After the hearing, the Appeal Panel conducted a "straw vote" resulting in four votes to sustain the recommendation of the University Committee to deny promotion and tenure and two votes to overturn it. *See* Martin aff. ¶ 61. However, because of Harris' recommendation on the basis of cultural diversity, "[t]here was concern [on the Appeal Panel] that possibly the University desired Rosado to be tenured for 'diversity of cultures' reasons." *See* Lohuis aff. ¶ 60. One member of the panel, Ardyth Lohuis, then changed her initial vote and voted to "overturn the recommendation to create a tie vote [at the Appeal Panel level] which would allow the administration the opportunity to make the final decision.'" *See id.* at ¶ 61. Consequently, the vote produced a tie with three members voting to sustain the recommendation of the University Committee and three voting to overturn that recommendation.

This tie vote was submitted to the President of VCU, Eugene Trani, a white male. *See* Def.Ex. 27. Trani determined that the Appeal Panel had failed to take one of the only two proper courses of action permitted by the VCU Policy controlling appeals: (1) reverse the previous decision and recommend promotion and tenure, or (2) affirm the previous decision and reject promotion and tenure. For that reason, on June 9, 1994, Trani returned the findings of the Appeal Panel to its Chairman, Billy R. Martin, and instructed the Appeal Panel to make one of the two decisions which, under VCU's procedures, it was required to make. *See* Def.Ex. 28.

---

4. Cultural diversity is not among the factors which the policies and criteria controlling promotion and tenure identified as pertinent to the tenure or promotion decision. It is thus unclear why Harris injected that issue into the process.

5. The Appeal Panel allowed Rosado to speak longer than its procedures prescribe, to call more witnesses than those procedures allow, and to present materials not normally permitted.

The next day, Martin spoke with each member of the Appeal Panel individually by telephone and asked whether the member desired to reconvene or simply to reconsider the vote. The members decided not to reconvene and instead registered their votes individually to Martin. On the subsequent vote, Lohuis cast her ballot in accord with her view on the merits of the case, which was to uphold the University Committee's recommendation to deny promotion and tenure, again resulting in a 4 to 2 vote against promotion and tenure. *See* Def.Ex. 29; Lohuis aff. ¶ 64.

The results were re-submitted to Trani, who then reviewed the file on its merits and, on June 13, 1994, concurred with the Appeal Panel and decided not to recommend Rosado for promotion and tenure to the VCU Board of Visitors. *See* Def.Ex. 30. Because this was the final stage of the review and appeal process, Rosado was notified that academic year 1994–95 would be her last year of service. Rosado left VCU on May 15, 1995 and her position as Assistant Professor on the foreign languages faculty was subsequently filled by a white male.

## DISCUSSION

On July 12, 1994, Rosado filed a discrimination charge with the Equal Employment Opportunity Commission and received a Notice of Right to Sue on July 7, 1995. *See* Def.Exs. 33, 33A. She filed a Complaint in this action on September 8, 1995 and an Amended Complaint on December 18, 1995, alleging that she was denied promotion and tenure because of her gender and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Rosado seeks declaratory and injunctive relief, compensatory damages, and attorney's fees. The case is before this court on the Motion for Summary Judgment of VCU. For the reasons set forth below, the motion is granted.

### I. Summary Judgement Standard

Summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The rules further provide:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

It is the responsibility of the party seeking summary judgment to inform the court of the basis for its motion, and to identify the parts of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 216 (4th Cir.1987). "[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories and admissions on file.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The moving party may also use affidavits to support its motion. Then the non-moving party must go beyond the pleadings and, by citing its own affidavits or by citing "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* Opposition to a properly documented summary judgment motion may not be based solely on the pleadings. *Id.*

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505,

2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original). It is the function of the district court not to weigh the evidence, but to determine whether there is a genuine issue for trial, and "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510–11 (citations omitted). Hence, summary judgment is appropriate if the evidence is "merely colorable" or "not significantly probative." *Id.* at pp. 249–50, 106 S.Ct. at 2510–11 (citations omitted).

■ The standard for summary judgment mirrors the standard for directed verdict (now judgment as a matter of law) under Rule 50(a), Fed.R.Civ.P., the principal difference being procedural. *Id.* at 251, 106 S.Ct. at 2511–12. And, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party, however, "need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15. The district court also "must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513.

■ Furthermore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513–14. Summary judgment is appropriate only if, upon consideration of the record as a whole, a reasonable trier of fact could not find for the non-movant. *Allstate Fin. Corp. v. Financorp, Inc.,* 934 F.2d 55, 58 (4th Cir.1991). But, where a faithful examination of the record establishes the absence of a genuine issue of material fact, it is "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987); *see also Guinness PLC v. Ward,* 955 F.2d 875, 883

(4th Cir.1992). With these principles in mind, the court will consider the motion for summary judgment filed by the defendant.

## II. Title VII Analysis

■ The analysis of a claim of discrimination in a tenure decision begins with the premise that courts:

> must be ever vigilant in observing that we do not sit as a super personnel council to review tenure decisions, ... always cognizant of the fact that professorial appointments necessarily involve subjective and scholarly judgments, with which we have been reluctant to interfere.

*Jiminez v. Mary Washington College,* 57 F.3d 369, 376 (4th Cir.) (internal citations omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 380, 133 L.Ed.2d 304 (1995). And, it is necessary to keep in mind that "Title VII does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision among candidates not be discriminatory." *Thomasko v. University of South Carolina,* 1985 WL 6455, *6 (D.S.C.) (citing *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir.1980)).

■ In order to prevail on a Title VII claim, Rosado must prove that she was a victim of unlawful discrimination and "but for" that discrimination, she would not have been rejected for promotion and tenure. *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 238 (4th Cir.1982). Rosado may meet her burden of proof through ordinary principles of proof, such as direct evidence of discrimination or cumulative indirect evidence of her employer's motivation. *Ballinger v. North Carolina Agr. Ext. Svc.,* 815 F.2d 1001, 1005 (4th Cir.), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). There is no direct evidence of discrimination against Rosado.

■ However, because subjective intent or motivation is so difficult to prove, Rosado may rely upon the judicially-created proof scheme for Title VII cases. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S.

248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Rosado has relied on this alternative proof mechanism in addressing the summary judgment motion.

Under this judicially-created scheme, a plaintiff must first establish by a preponderance of the evidence a prima facie case, thus creating a rebuttable presumption of discrimination. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. If the plaintiff succeeds, the burden then shifts to the employer to rebut "the presumption by producing evidence that its actions were based upon legitimate, non-discriminatory reasons." *Id.* at 255, 101 S.Ct. at 1094–95. The employer is not required to prove absence of discriminatory motive, but merely to articulate some legitimate reason for its action. If the employer carries this burden of production, the presumption in favor of the plaintiff is destroyed. *Id.* at 255, 101 S.Ct. at 1094–95. Then, the plaintiff bears the burden of demonstrating by a preponderance of the evidence that the proffered reasons were not true reasons, but rather were a pretext for discrimination. *Id.* at 256, 101 S.Ct. at 1095. The plaintiff's burden of persuasion, retained throughout, would then "merge[ ] with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.; see also Evans v. Technologies Applications and Service Co.,* 80 F.3d 954, 959 (4th Cir.1996); *Ballinger,* 815 F.2d at 1005.

### A. *Prima Facie Case*

■■■ The burden of establishing a prima facie case of discrimination is not an onerous one because a plaintiff must demonstrate, by a preponderance of the evidence, simply that she was a member of a protected class who was qualified for an available position but was rejected under circumstances giving rise to an inference of discrimination. *Burdine,* 450 U.S. at 252–253, 101 S.Ct. at 1093–94. The Fourth Circuit has adapted the following paradigm in Title VII cases involving the denial of promotion and tenure by requiring proof that the plaintiff: (1) is a member of a protected class; (2) applied for promotion and tenure; (3) was qualified for promotion and tenure; and (4) was rejected under circumstances giving rise to an inference of

unlawful discrimination. *Alvarado v. Board of Trustees of Montgomery Community College,* 928 F.2d 118, 121 (4th Cir.1991); *Smith v. University of North Carolina,* 632 F.2d 316, 340 (4th Cir.1980).

● Elements 1 and 2: Protected Class and Application

The first two elements generally are not difficult to establish and they have been met here because (1) Rosado, a Puerto Rican woman, is clearly a member of protected class who (2) applied for promotion and tenure in September of 1993.

● Element 3: Qualification

■■■ The third component of Rosado's burden is to establish by a preponderance of the evidence that she was qualified for promotion and tenure. In general,

> [a] teacher's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations, determinations which do not lend themselves to precise qualifications and are not susceptible to mechanical measurement or the use of standardized tests.

*Clark v. Whiting,* 607 F.2d 634, 639 (4th Cir.1989). Accordingly, courts review such matters with "great trepidation." *Jiminez,* 57 F.3d at 376.

Qualification, of course, lies at the heart of tenure decisions and courts:

> should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

*Jiminez,* 57 F.3d at 377 (quoting *Kunda v. Muhlenberg College,* 621 F.2d 532, 548 (3th Cir.1980)).

Here, the undisputed record is that Rosado was generally well-regarded as a teacher

and that her service to the university community was fully acceptable, if not superior. Thus, she satisfied those two facets of the criteria which define eligibility for tenure and promotion to Associate Professor at VCU. However, the facts of record also support the conclusion that Rosado did not meet the requirement that she establish "a clear pattern of academic accomplishment, particularly in the area of teaching and *research*, which indicates progress toward a national reputation" as required by the promotion and tenure criteria for the college in which she taught.

Although Rosado's research was rated "satisfactory" by the Peer Review Committee and the Department Chair, the College Committee, the Dean, and the University Committee determined her scholarly research and publication to be unsatisfactory because Rosado failed to establish the "clear pattern" of professional, scholarly accomplishment required by the controlling criteria. Even Dr. Harris, the Provost, on whose judgment Rosado fastens so much of her case, did not recommend tenure on the basis of "teaching and research," as required by the tenure criteria, but rather on "teaching and diversity of culture" in the faculty, which is nowhere mentioned in the criteria. That endorsement is notable for its omission of any reference to the research scholarship required by the tenure criteria.

Thus, on this record, it can be said only that Rosado has presented evidence that the Peer Review Committee, comprised of her departmental colleagues, considered her research to have been satisfactory. But, neither the Peer Review Committee nor the Department Chair found that she had established "a clear pattern of academic accomplishment, particularly in the area of teaching and research, which indicates progress toward a national reputation." In fact, the departmental recommendations simply skirt the key issue whether Rosado satisfied the controlling criteria. Instead, the reports of the Peer Review Committee and the Department Chair are replete with praise of Rosado's teaching and service of such a volume as to suggest a deliberate attempt to avoid confessing the obvious: Rosado did not meet the research/scholarship criteria for tenure or promotion to Associate Professor.

The absence of a finding of "a clear pattern of academic accomplishment" by the Peer Review Committee and the Department Chair is fatal to Rosado here because of the consistent findings to the contrary at all levels beyond the Department and because the reports of the Peer Review Committee and the Department Chair demonstrate, on their face, an absence of support for the conclusion they reached. Hence, on this record, Rosado has failed to meet the third component of her prima facie case: that she was qualified for the position which she sought. Indeed, to submit the record here for decision by a jury would represent precisely the kind of intrusion into the tenure and promotion process which *Jiminez* and *Clark* explicitly prohibit.

In promotion and tenure cases, the prima facie case calculus often conflates the third (qualification) and fourth (circumstances suggesting discrimination) factors into the same analysis because the fourth factor is often merely the converse of the third. To a certain extent, that is what the briefs of both parties have done in making the prima facie case analysis in Rosado's case. The preferable analytical approach, however, is to require in promotion and tenure cases that the plaintiff establish as an element of her claim that she is qualified in the sense that she meets the criteria set by the institution for promotion and tenure. As explained above, Rosado has not discharged that burden and the defendant is entitled to summary judgment for that reason alone.

● Element 4: Surrounding Circumstances—Inferred Discrimination

 However, even if Rosado had established a prima facie showing of qualification, she would not survive summary judgment because she has not satisfied the fourth component of her burden: that the circumstances surrounding the rejection of her request for tenure and promotion to Associate Professor raise an inference of discrimination based on gender or national origin. This element is more difficult to establish than the first three but is

satisfied in cases of faculty promotion by ... show[ing] that the college had promot-

ed other faculty members with qualifications similar to those of the Title VII plaintiff to the desired faculty rank at approximately the same time.

*Smith v. University of North Carolina,* 632 F.2d 316, 341 (4th Cir.1980).

Rosado's pleadings vacillate on this point and often tend to confuse this factor with the qualification factor. But, as best the court can determine, the discriminatory circumstances cited by Rosado are that:

(1) comparable candidates were held to lesser standards and granted tenure and promotion;

(2) a member of her Peer Review Committee sabotaged her bid for promotion and tenure because of his abnormal fascination with her gender and ethnicity;

(3) statistics demonstrate that at VCU, females and minorities are promoted and tenured less frequently than males and non-minorities;

(4) publishing in Spanish damaged her bid for tenure and promotion;

(5) the "tie-breaker" procedure used by the Appeal Panel and the University President was unorthodox and discriminatory; and

(6) her replacement in the Department of Foreign Languages was a white male.[6]

After consideration of each of these circumstances, it is clear that Rosado has presented no credible evidence to establish that her gender or national origin was a determining factor in VCU's decision not to promote her or award her tenure.

### 1. *Unequal Standards*

■ First, Rosado alleges that other candidates were held to lesser standards than she and, consequently, were awarded tenure and promotion on records comparable to hers. These unequal standards include: (a) amount of scholarly output required; (b) number of outside reviewers utilized; (c) con-

sideration of unpublished works towards promotion and tenure; and (d) consideration of creative writing towards promotion and tenure.

### (a) *Scholarly Output—Publications*

In the area of scholarly output, Rosado points out that Gregory Donovan, a white male who received tenure the year before Rosado applied, demonstrated a less impressive scholarly output than did Rosado, because only one of his books of poems had been accepted for publication (but not yet published) and he had authored no other publications. *See* Amended Memorandum in Response to Defendant's Motion for Summary Judgment at 9. By contrast, Rosado avers that she:

had a book of literary criticism accepted for publication, a book of short stories which was published during the tenure process, several poems both published and accepted for publication, and an article and a book of poems completed but not yet accepted for publication.

*Id.* at 14.

However, a review of Donovan's Fall 1992 curriculum vitae, discloses that, contrary to Rosado's assertion, Donovan had published nine poems and one work of short fiction since he began teaching at VCU in 1983, with publications occurring in the years 1984, 1986, 1990, 1991, and 1992. *See* Def.Ex. 41KK. In contrast, the curriculum vitae which Rosado submitted with her application for promotion and tenure reveals that Rosado had published nothing during her probationary period. *See* Def.Ex. 12. It is true that two of Rosado's books and three of her poems had been accepted for publication, and that she had two works in progress. However, Donovan, too, had two poems forthcoming in the Fall and Winter of 1992, and one book of poems accepted for publication in the Fall or Spring of 1993. *See* Pl.Ex. 8; Def.Ex. 41KK.[7] Thus, the objective evidence estab-

---

**6.** At oral argument on this motion on March 26, 1996, Rosado abandoned the allegations of past gender and race discrimination by VCU which she set forth in her Amended Response to Defen-

dant's Motion for Summary Judgment because they are irrelevant to this litigation.

**7.** Moreover, the collection of Donovan's poems had been accepted for publication by the Univer-

lishes that the records of publication by Donovan and Rosado were not, in fact, comparable. Consequently, this prong of Rosado's discriminatory circumstances argument fails.

#### (b) *Outside Reviewers*

Rosado also alleges that other faculty members were held to less stringent standards in the tenure review process because they were required to submit to fewer outside reviewers than were required in her case. Donovan, for example, was only required to have three reviewers, while she had eight. Rosado complains that she was the only member of the Department of Foreign Languages seeking an Associate Professorship required to submit to that many outside evaluators.[8]

However, the record reveals that VCU's tenure policies require no specific number of outside reviewers. *See e.g.*, Def.Ex. 35C; Hiley aff. ¶ 25; Stackhouse aff. ¶ 19. The number appears to be left to the discretion of the College and the Department. In considering this facet of Rosado's argument, it is important to note that Rosado herself requested three of her reviewers and that she did not contest the total number of reviewers until after she filed this action. Moreover, the record indicates that it was necessary to have more reviewers for Rosado's work because she published in Spanish, rather than in English, and she wrote both literary criticism and creative works, thus requiring reviewers schooled in each genre. *See* Dvorak aff. ¶ 35; Sims aff. ¶ 13.

In any event, the record shows that other candidates with successful tenure bids have been required to have up to 12 outside reviewers. *See* Def.Ex. 47. In fact, Rosado's own evidence indicates several female faculty members seeking tenure and promotion from Assistant to Associate Professor had anywhere from 3 to 10 outside reviewers. *See* Knobbe aff. In short, there is no credible

basis to infer that the number of outside reviewers was anything more than the product of an effort to ensure a full review of Rosado's varied works by qualified reviewers.

#### (c) *Unpublished Works*

Rosado next alleges that she was held to a different standard than comparable candidates because her unpublished works were not considered, even though the College Promotion and Tenure Guidelines expressly permit consideration of unpublished works, *see* Def.Ex. 35I, and even though Donovan's unpublished book of poetry attracted substantial attention from his reviewing committees. However, Rosado fails to advance any evidence that her unpublished works were not, in fact, considered during the tenure process.

VCU, on the other hand, has offered numerous affidavits from members of the review committees indicating that they did consider everything which Rosado represented either to have been published through 1994 or accepted for publication. *See, e.g.*, Bendersky aff. ¶ 14; Kier aff. ¶ 14; Craig aff. ¶ 14, Rezba aff. ¶ 14. More importantly, the reports of each committee and the Appeal Panel reveal beyond question that her unpublished works were considered. To withstand a motion for summary judgment, the non-moving party cannot rest on unsubstantiated allegations. Because VCU's affidavits on this point are uncontroverted by Rosado, there is no basis on which to predicate an inference of discrimination by VCU. In fact, Rosado's assertion of this point is simply frivolous.

#### (d) *Creative Works*

Finally, Rosado complains that her creative writing was not given due credit by her reviewing committees while Donovan's creative writing clearly contributed to his suc-

---

sity of Missouri Press, a leading academic publisher of poetry that is rigorously peer-reviewed. Notably, this collection had, at the time of Donovan's tenure application, won the University of Missouri Press' prestigious Devlin Prize. This progress towards a national reputation evidently made up for the relatively small number of publications he had accomplished since arriving at VCU. *See* Def.Ex. 41J.

8. Sims, also in the Department of Foreign Languages, had eight outside reviewers in 1991–92. *See* Def.Ex. 47. But, he was seeking promotion to Full Professor rather than to Associate Professor.

cessful tenure application. Once again, Rosado has failed to produce any evidence to support the allegation that her creative writing was not, in fact, considered by her committees.

VCU has submitted several affidavits attesting to the fact that one of the reasons it was necessary to have eight outside reviewers was that Rosado submitted, and the committees reviewed, works of both creative writing and literary criticism. The committees wanted to ensure that there were enough outside reviewers to comment on, and give Rosado credit for, both the creative writing offerings and the literary criticisms. *See* Dvorak aff. ¶ 35; Sims aff. ¶ 13.

Moreover, VCU has shown that each reviewer was provided with copies of Rosado's creative works, including the manuscript collection of her short stories and poems, and excerpts from a novel in progress. *See* Dvorak aff. ¶ 37; Sims aff. ¶ 16. The record also contains a copy of the letter which was mailed by the Peer Review Committee to each reviewer, noting that Rosado's scholarly work cut across many areas, including creative writing, and that the reviewers should bear these interests in mind as they evaluated her record. *See* Def.Ex. 14; Dvorak aff. ¶ 37; Sims aff. ¶ 16. Various committee members, too, stated that they considered her creative writing. *See* Nicholson aff. ¶ 23; Latane aff. ¶ 23; Vallerino aff. ¶ 21; Hiley aff. ¶ 24. Likewise, all committee reports and the record of the Appeal Panel show that Rosado's creative works were considered. Because Rosado has not offered any evidence to support the charge that her creative writings were not considered, there is no permissible inference of discrimination on that score. Her assertion of this ground is also frivolous.

In sum, Rosado has failed to establish that VCU maintained unequal standards, which were applied to her in a discriminatory manner as compared with other comparable faculty members.

## 2. *Dr. Sims*

The second alleged circumstance offered by Rosado to establish an inference of discrimination by VCU is the contention that a member of her Peer Review Committee, Dr. Robert Sims, harbored romantic and sexual feelings for her. This is founded on the fact that on May 18, 1994, Sims wrote a rambling, fairly torrid, sometimes crude, and thoroughly tasteless letter to Rosado, in which he proclaimed his passion for Rosado, made sexually explicit remarks about her, and expressed his feelings about what he perceived to be their actual and potential relationship. *See* attachment to Risso aff. Rosado alleges that, because of this interest, Sims sabotaged her chances for tenure. For example, she charges that Sims was responsible for the large number of outside reviewers of Rosado's scholarship; that he lost letters which indicated publication dates for her scholarship;[9] that he testified falsely before the Appeal Panel that she had not published since coming to VCU; and that he demeaned the publisher of her book.

While this letter, first revealed by Rosado as an attachment to her response to VCU's Motion for Summary Judgment, is unprofessional, unseemly, and in places outright offensive, it does nothing to create an inference that Rosado was denied promotion and tenure because she was a Puerto Rican female. To the contrary, the contemporaneous record and several unrebutted affidavits demonstrate that Sims was a steadfast and loyal advocate of Rosado's on the Peer Review Committee and thereafter. At a September 1993 meeting of the Peer Review Committee, for example, Sims brought to the attention of the rest of the Committee that Rosado's curriculum vitae should be supplemented because it did not reflect her work on a successful Spanish film festival in the Fall. *See* Sims aff. ¶ 15; Dvorak aff. ¶ 36. Moreover, Sims and the rest of the Peer Review Committee actually recommended that Rosado be promoted and that she be awarded tenure. *See* Def.Ex. 16.

---

9. Sims denies intentionally losing or misplacing these letters. *See* Sims supplemental aff. ¶ 5, April 11, 1996. Because Rosado fails to offer any evidence to the contrary other than her own bald allegations, she fails to establish a genuine issue of material fact with respect to this incident. Moreover, even if the letters were lost, there is no showing by Rosado that the dates referred to in their text could not be shown by other evidence.

Subsequently, Sims voluntarily appeared on Rosado's behalf at a May 1994 Appeal Panel hearing and asserted that she was "well on her way to developing a national and international reputation." *See* Sims aff. ¶ 11; Martin aff. ¶ 40. Although Sims also discussed with the Appeal Panel some of Rosado's weaknesses, such as her scant publication record and the relative obscurity of her small publisher, he evidently did so in response to questioning by the Appeal Panel and was merely stating objective facts, which were unrelated to Rosado's gender or ethnicity. Finally, Sims wrote a letter to Provost Harris, after VCU reached its decision not to promote or tenure Rosado, further advocating her qualifications. *See* Def.Ex. 45.

Rosado has offered no evidence to rebut the showing made by VCU that Sims' conduct in the tenure process was anything other than fully supportive of Rosado. There is nothing in the record to create an inference that Sims undermined Rosado's tenure bid because of her gender or national origin. To the contrary, his participation undoubtedly biased the Peer Review Committee in her favor rather than to her detriment.

### 3. *Statistics*

The third basis on which Rosado contends that the evidence gives rise to an inference of discrimination is an affidavit from an expert witness which asserts that statistics demonstrate that, at VCU, females and minorities are promoted and tenured less frequently than males and non-minorities. Rosado's expert witness, labor economist Paul F. Hogan, reports that while white males received tenure 94.2% of the time during the relevant time period (1988 to 1995), females received tenure only 70.6% of the time. Likewise, while non-minorities received tenure 88% of the time, minorities received tenure only 50% of the time. *See* Hogan aff. According to Hogan, these figures indicate almost a two-point standard deviation which belies the existence of a random, unbiased tenured process. *Id.*

Although, under certain circumstances, statistics can give rise to a prima facie case of a pattern or practice of discrimination, *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), statistics alone do not give rise to an inference of discrimination, especially in a university setting where the criteria used to make tenure decisions varies substantially among departments. *See, e.g., Thomasko,* 1985 WL at *6; Note, *Proving Qualification in a University Setting: McDonnell Douglas and the Tenure Cases,* Vol. XII Fordham Urb.L.J. 459, 477 (1984). In any event, because statistics may be easily manipulated, courts must give close scrutiny to the empirical proof on which statistical models are erected. *E.E.O.C. v. Western Elec. Co., Inc.,* 713 F.2d 1011, 1018 (4th Cir.1983).

Rosado has not offered any of the empirical data which would be essential to a proper assessment of Hogan's calculus. Without knowing the qualifications of the women and minorities who applied for tenure, such as their length of service, credentials, and scholarly achievements, or the individualized criteria for tenure and promotion in the departments in which these applicants teach, the court cannot infer that they were denied tenure because of discrimination by VCU. This is particularly true because other evidence before the court suggests that members of both protected groups were promoted and tenured during the same round of reviews as Rosado. For example, Dr. M. Samy El–Shall, an Egyptian male, and Dr. Vickie Wysocki, a white female, were highly recommended for promotion and tenure at every level of the review process. *See* Def.Exs. 37, 38. In addition, that same year, VCU rejected the bid of a white male, R.A. Fine, for tenure and promotion. *See* Rezba aff. ¶ 19; Kier aff. ¶ 19; Craig aff. ¶ 19; Bendersky aff. ¶ 19.

Furthermore, the Supreme Court has stated that "[a]s a general rule . . ., if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the [selection process] was random would be suspect. . . ." *Castaneda v. Partida,* 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498 (1977). The Fourth Circuit has refined this analysis by warning courts to "be extremely cautious in drawing any conclusions from standard deviations in

the range of one to three." *E.E.O.C. v. American Nat. Bank,* 652 F.2d 1176, 1192 (4th Cir.1981), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). Therefore, even accepting Hogan's numbers as perfectly valid and substantiated, he notes only a two-point standard deviation, which under the law of this circuit, is not sufficient to establish a biased process.

Accordingly, Rosado has failed to substantiate an inference of discriminatory motivation with these statistics. In fact, at the hearing on this motion, plaintiff's counsel could not point to any minority female, other than the plaintiff, who had been denied promotion and tenure. That simply is not statistically significant. *See, e.g., Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 511 (4th Cir.1994); *E.E.O.C. v. Federal Reserve Bank of Richmond,* 698 F.2d 633 (4th Cir.1983), *rev'd on other grounds sub nom.* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984).

### 4. *Publishing in Spanish*

■ Rosado also claims that discriminatory intent can be inferred from the fact that she published in Spanish. In support of this allegation, she notes that Hiley indicated that it was difficult to assess her work. *See* Hiley aff. ¶ 25. However, this statement by Hiley is, on its face, one of fact and is in no way discriminatory. Furthermore, the record shows that, because Rosado published in Spanish, VCU arranged for a sufficient number of outside reviewers, who could speak Spanish, to read her work first-hand, and offer fair and educated feedback to the reviewing committees. *See* Hiley aff. ¶ 25. This is accommodation, not discrimination.

When asked by the Appeal Panel whether the language of her work hampered his evaluation of Rosado's record, Hiley stated that it did not for the same reason that he is able to evaluate the record of a polymer chemist without understanding chemistry. That is, in reviewing the tenure application of a faculty member whose expertise is outside that of his own, Hiley typically relies upon peer reports, referred journals and their publication processes, and outside reviewers, in making an informed determination. *See* Hiley aff. ¶ 37. Moreover, several members in the review process indicated that it was not necessary to be able to read Spanish in order to evaluate Rosado's candidacy. *See, e.g.,* Godwin–Jones aff. ¶ 14; Martin aff. ¶ 57. In sum, here too Rosado relies on conjecture and speculation which is refuted by concrete evidence presented by VCU. And, on this point too, Rosado has utterly failed to raise an inference of discriminatory treatment based on national origin.

### 5. *The Allegedly Suspicious Appeals Procedure*

■ Rosado also finds discrimination in what she considers to be an unusual resolution of the tie vote on her candidacy at the Appeal Panel level. The circumstances surrounding the re-vote, says Rosado, are suspect because nothing in the VCU Policy provides for a second vote or for a revision of the Appeal Panel's initial decision. *See* Def. Exs. 34G, I. Although Rosado is correct on that point, she ignores that the appeal procedure requires the Appeal Panel to take one of two courses, which it did not do. Thus, there was created a situation generally not addressed by the procedure. Confronted with that circumstance, Trani, who was required by the procedure to review and act upon the Appeal Panel's decision, took the rather unremarkable step of remanding the decision to the Appeal Panel with instructions for it to do as it was supposed to do, vote the matter up or down. Although Trani might have acted otherwise, there is certainly nothing of a discriminatory nature to be drawn from the reasonable course he, in fact, took. In like fashion, there is nothing discriminatory in the informal method by which Martin conducted the revote.

Thus, while it is true that VCU would be wise to prescribe some standard procedure for resolving a tie at the Appeal Panel level, nothing in Rosado's evidence suggests any discriminatory intent or behavior in what occurred there. In fact, the reason that there was a tie in the first place belies any inference of discrimination. It must be remembered that Appeal Panel member Lohuis cast her vote for promotion and tenure, against her best judgment, solely and expressly for the purpose of creating a tie so that the ultimate decision would be made by the University President. This, of course,

was helpful to Rosado because, although Lohuis personally felt that Harris' consideration of "diversity of cultures" as a University objective was inappropriate in the tenure decision, Lohuis wanted to permit the VCU Administration to decide for itself whether to consider that factor. *See* Lohuis aff. ¶ 61. When Trani remanded the tie vote to the Appeal Panel and insisted on a decision one way or the other, Lohuis merely reinstated her initial vote to recommend denying Rosado's promotion and tenure application. *See* Lohuis aff. ¶ 64.

Clearly, this extra, albeit unusual, step in the tenure process only afforded Rosado one final opportunity to convince VCU that she should be promoted and tenured. Nothing that occurred in the remand process suggests that any discriminatory motivations were at work.

### 6. *Replacement By A Person Outside of Protected Class*

 Finally, Rosado finds discrimination in the undisputed fact that her replacement in the Department of Foreign Languages was McKenna Brown, a white male. Brown, however, was not hired as a tenured Associate Professor, the position which Rosado sought. Consequently, the record on this point does not help Rosado to establish a prima facie case of discrimination.

In conclusion, the record simply shows no discrimination in the tenure process or decision. Rosado thus has failed to establish a prima facie case on the fourth prong of the *Burdine* formulation.

### B. *Non–Discriminatory Reasons*

 Even assuming, *arguendo*, that Rosado had succeeded in the "relatively easy" task of establishing a prima facie case, VCU has articulated legitimate, non-discriminatory reasons for its actions.

VCU holds a Carnegie classification of Research I, which places it in the top tier of universities in terms of research missions. *See* Hiley aff. ¶ 3. The comments of the members of the promotion and tenure committees reflect a reasoned decision not to promote or grant tenure based on lack of a constant and satisfactory record of research and publication. Notwithstanding that Rosado was alerted several times during her annual reviews that she needed to concentrate on getting her works into print, Rosado did not publish a single scholarly work during her probationary period at VCU.[10] *See* Def. Exs. 12D, E. Rosado received her doctorate in 1982 and, as of September 1993, despite these repeated warnings, the curriculum vitae she submitted to the Peer Review Committee indicated she had only published three works, all prior to her term at VCU: a collection of poems in 1984 and two symposia papers in 1980 and 1984. *See* Def.Ex. 12. Moreover, the 1980 article could not be located and the 1984 article evidently only exists in abstract form. *See* Def.Exs. 16H, I. Further, two books which were accepted for publication at the time of her application were being published by presses whose reputation and impact in terms of dissemination was questionable.[11] Importantly, Rosado had no peer-reviewed articles in scholarly journals.

When compared with the high productivity of most of the candidates whom the committees reviewed, Rosado simply fell short. For example, while Donovan, like Rosado, was warned during his annual reviews that his scholarly productivity was lacking, he, unlike Rosado, heeded that warning and began publishing during the latter part of his probationary period. The high quality of his subsequent work compensated for the relatively small volume of it. *See* Def.Ex. 41J. In addition, none of the other candidates under consideration for promotion and tenure at the same time as Rosado received a single

10. The updated vitae considered by the Appeal Panel, which included works published or accepted for publication after her probationary period, indicates that Rosado had published one book of short stories in late 1993 and three poems in early 1994. In addition, she had accepted for publication by this time a book of literary criticism, a book of poetry, and a short

story. *See* Def.Ex. 26U. All of this occurred after the probationary period and during the promotion and tenure evaluation process.

11. In fact, no other book could be found published by Sara Grecco, publisher of Rosado's book of short stories. *See* Latane aff. ¶ 15, 16.

vote below "very good" in research. *See* Latane aff. ¶ 12; Vallerino aff. ¶ 11. Several committee members also noted that even Rosado's most positive outside reviewers were not as strong as those of other candidates. *See e.g.,* Bendersky aff. ¶ 12; Kier aff. ¶ 12; Rezba aff. ¶ 47; Craig aff. ¶ 12. According to committee members at several levels of review, Rosado did not demonstrate "a clear pattern of accomplishment, particularly in the areas of teaching and research, which indicates progress toward a national reputation." *See* College Promotion and Tenure Guidelines, Def.Ex. 35; Nicholson aff. ¶ 26; Bendersky aff. ¶ 10; Martin aff. ¶ 60.

The record here shows that VCU has met its burden to put forward a non-discriminatory reason for its decision not to promote Rosado to Associate Professor or to award her tenure.

### C. *Pretext*

Because VCU has asserted legitimate, non-discriminatory reasons for its decision to withhold tenure and promotion, the burden then shifts back to Rosado to prove that these proffered reasons are pretextual. To satisfy this burden, "the plaintiff must prove '*both* that the reason was false, *and* that discrimination was the real reason' for the challenged conduct." *Jiminez,* 57 F.3d at 378 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993)) (emphasis in original). Rosado offered no competent evidence that VCU's reasons are false, much less that its true motivations in rejecting her application are gender and national origin discrimination. The direct and circumstantial evidence offered by Rosado, even if accepted as true, does not support a factual determination that, but for her gender and ethnicity, VCU would have promoted her and awarded her tenure.

In fact, there is nothing to suggest that anything other than Rosado's lackluster publication record accounted for VCU's decision not to promote her or grant her tenure. Virtually every affidavit submitted by VCU states that neither gender nor national origin was a negative consideration in any of many levels of deliberations. And, the only mention of her gender and ethnicity was how beneficial such characteristics would be to VCU's goals of "cultural diversity and excellent teaching." *See* Def.Ex. 23; Harris aff. ¶ 7; Butler aff. ¶ 67.

Furthermore, the record is replete with instances where she was given special treatment and extra assistance by her colleagues at every level of the review process. For example, at the departmental Peer Review level, Dvorak and Sims felt that because her scholarship was in two areas, literary criticism and creative writing, it would be beneficial to Rosado to have a larger group of outside reviewers schooled in both areas.[12] Moreover, of her eight reviewers, she was permitted to select three.[13]

At the College Committee level, Lidia Vallerino, because she viewed Rosado's gender and ethnicity as assets to VCU, endeavored to work especially hard to ensure that Rosado was promoted and tenured. *See* Vallerino aff. ¶ 27. Moreover, Provost Harris even went so far as to base her recommendation in support of Rosado in part on her ethnicity, which Harris felt contributed to cultural diversity at VCU. At the Appeal Panel level, Rosado was permitted to submit an updated vitae and additional documentation of materials accepted for publication or published after her initial application for tenure in September of 1993, even though this was not standard practice. Moreover, she was given an opportunity to address the panel on her own behalf for more than the two hours permitted by the rules and regulations. Additionally, she was permitted to invite five people to appear on her behalf, when the norm is one or two. Finally, Lohuis orchestrated a tie vote in order to acquire an

---

12. In addition, they felt that because of Rosado's lack of published materials, especially in peer-reviewed journals, which would have helped the committees assess the quality of her work through the input of other experts in the field, additional outside reviewers could prove essential.

13. One of the three she selected, Keith McDuffie, stated that "she really has not yet clearly established her own critical voice." *See* Def.Ex. 15.

additional level of review for Rosado. This substantial measure of additional benefit extended to Rosado undercuts her assertion of discrimination.

Of course, these additional considerations—recommending promotion and tenure for cultural diversity reasons when that is not an established criteria, changing a vote in order to allow consideration of an unarticulated criteria such as cultural diversity, helping a colleague because of gender or ethnicity—have no proper place in the making of tenure or promotion decisions. Moreover, the departure from established criteria and procedure visits detrimental effects on the individual candidate being favored as well as upon all candidates not so favored. Here, Rosado has no legally cognizable complaint by virtue of these departures from the established criteria because those departures only served to help her cause. Nonetheless, because improper considerations were at play here, Rosado was misled into believing that something other than her own performance was responsible for her unsuccessful application for promotion and tenure. That likely would not have occurred if: (i) the Peer Review Committee and the Department Chair had measured Rosado against the controlling criteria, rather than attempting to help her cause by measuring her against different standards; (ii) Harris had not interjected a factor not provided by the criteria; and (iii) the Appeal Panel had not acted to help Rosado by artificially creating a tie vote, thereby necessitating a remand. Indeed, if Rosado had been informed that the uniform application of established criteria had resulted in a uniform judgment at each level, she probably would have found the denial of her application understandable.

By failing to adhere to the established criteria, Rosado's well-intentioned supporters created a circumstance under which Rosado could erroneously blame others for the fate she herself had authored. Rosado, of course, was not the only victim of the interjection of these improper factors into the process. VCU also was injured by virtue of the need to defend this action, and, the promotion and tenure process itself suffered. But, whatever else may be said about them, these factors do not bespeak pretext.

## CONCLUSION

For the foregoing reasons, the court concludes that Rosado has failed to carry her burden of persuasion under *McDonnell Douglas* and its progeny. No reasonable jury could find in her favor and VCU is entitled to judgment as a matter of law. Hence, the Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56(c) is granted.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.