**Dawn M. MENTCH, Plaintiff,**

v.

**EASTERN SAVINGS BANK, FSB et al., Defendants.**

**Civil No. AMD 95–3812.**

United States District Court, D. Maryland.

Jan. 8, 1997.

---

**9.** Pursuant to Fourth Circuit Local Rule 36(c), a copy of *Gay v. Grant* and *Holsey v. Smith* is attached.

John G. Koenig, Jr., Robinson & Koenig, Ellicott City, MD for plaintiff.

Francis R. Laws, Jonathan J. Biedron, Kollman & Sheehan, P.A., Baltimore, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

The plaintiff, Dawn Mentch, filed a four-count complaint against her former employer, Eastern Savings Bank, FSB ("ESB"), and Rick Proctor and Anthony Proffitt, an Assistant Vice President and a Senior Vice President, respectively, at ESB during Mentch's tenure. In count one, Mentch asserted a claim of pregnancy discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), on the basis of her non-promotion to the position of manager of the loan processing department, against ESB and Proctor.[1]

---

1. Mentch's complaint is notoriously imprecise. For example, throughout the complaint, Mentch employs the term "sex and/or pregnancy discrimination." In fact, as the summary judgment record makes clear, Mentch asserts *only* pregnancy discrimination claims; there is not a scintilla of evidence that the basis of her claims is gender discrimination on some theory other than preg-

nancy. In addition, as explicated in detail *infra* pp. 1243–44, Mentch's complaint has collapsed two discrete employment actions into one: she was denied a promotion, and she was transferred to a different department, where she performed different tasks. Mentch has not in any way alleged that the transfer, by itself, was a discriminatory act. Rather, her approach to the case

In count two, Mentch seems to have asserted—but has abandoned for purposes of summary judgment—a claim of hostile work environment on the basis of pregnancy under Title VII, against ESB and Proffitt. In counts three (now abandoned) and four Mentch asserted claims for breach of contract (in connection with her non-promotion and her inability to find an acceptable position with the bank upon her return from maternity leave, respectively), against ESB and Proctor. In a previous order, I granted the individual defendants' motions to dismiss for failure to state a claim.

Pending before the Court is ESB's motion for summary judgment. The parties have conducted extensive discovery, and the motion has been briefed; no hearing is necessary. For the reasons discussed below, the motion shall be granted.

(i)

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A fact is material for purposes of summary judgment if, when applied to the substantive law, it affects the outcome of the litigation.

*Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Shealy*, 929 F.2d at 1012. Furthermore, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Poller v. Colum-*

---

regards the transfer as simply a nonobjectionable incidence of the complained-of non-promotion, which she, confusingly, refers to as a "termination," although she was not then terminated by the bank, and even though she makes no claim in connection with the actual termination of her employment, which occurred many months later.

In moving for summary judgment, ESB has understandably taken what it regards as a comprehensive approach to Mentch's allegations, presuming that she is challenging independently both the non-promotion and the transfer, on

grounds of both pregnancy discrimination and non-pregnancy gender discrimination. Unfortunately, Mentch's response to the motion for summary judgment tends to exacerbate the confusion arising from the complaint rather than to lessen it. For example, Mentch has abandoned two of her claims *sub silentio;* she simply does not address them. In the final analysis, I have given plenary consideration to all of Mentch's properly alleged and supported claims and, for the reasons set forth, I am persuaded that she is not entitled to present them to a jury because she lacks sufficient probative evidence necessary to sustain any claim.

*bia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

(ii)

In setting forth this statement of facts, a cautionary note is appropriate. The summary judgment record includes, *inter alia*, transcripts of the testimony of many of the key witnesses who give first hand accounts of their acts and their states of mind. Much of the critical evidence Mentch relies upon, however, includes "facts" which have as their source Mentch's own beliefs and opinions, hearsay statements by Mentch as to what others said or thought, and vague and uncorroborated factual assertions by Mentch. This latter category, for example, includes Mentch's assertion that after she advised defendants that she was pregnant, she was excluded from meetings and her supervisor ceased consulting with her. I am mindful that in discrimination cases, as in some others, access to direct proof of the elements of a plaintiff's claims is often limited, at best. Nevertheless, consistent with Supreme Court and Circuit precedent, *see Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988); *Rudolph v. Hechinger Co.*, 884 F.Supp. 184, 188 (D.Md.1995), in applying the relevant legal tests to the facts viewed in the light most favorable to Mentch here, I have taken account of the ephemeral nature of Mentch's proof.

Mentch began working for ESB in July 1990 as a loan processor. Frank McInerney, then the Assistant Vice President with responsibility for the loan processing department, and Lois Ewing, the department manager who would be Mentch's immediate supervisor, hired Mentch. As a loan processor, Mentch prepared loan applications for underwriting by analyzing credit reports, pay stubs, tax returns, home appraisals, and other documents. ESB maintained a performance appraisal system under which employees were evaluated periodically. For 1990, Ewing rated Mentch's overall performance as "excellent," the highest rating an employee could receive. Ewing noted that Mentch could improve her performance by better adapting to changes in department procedures and by improving her ability to communicate with co-workers and others. For 1991 and 1992, Ewing rated Mentch's overall performance as "very good" or "commendable," the second highest rating an employee could receive. Again, Ewing noted that Mentch should continue to improve her interpersonal communication skills. Ewing felt that Mentch was a "natural leader," and regularly commented on Mentch's "leadership qualities." Notwithstanding these positive observations and despite overall ratings that were consistently at or near the top of the performance scale, throughout her first three years at ESB, Mentch's superiors consistently expressed concern over Mentch's "confrontational" style, and Mentch's recurrent inability to conform to management's expectations that she modify this aspect of her work performance. Mentch readily admitted on deposition that the concerns expressed to her in these regards were legitimate.

In October 1992, ESB promoted Mentch to senior loan processor and group leader. In this position (although she was not a part of management, was paid an hourly wage and thus earned overtime pay), Mentch supervised three loan processors, trained new employees, and acted as a liaison with the loan origination department. In Mentch's 1993 evaluation, which covered Mentch's 12–plus months as a supervisor, as in the earlier evaluations, Ewing sketched a portrait of an employee with significant positive, but also with significant negative, indicia of performance. Ewing commented, on the one hand, that Mentch's "natural leadership qualities enable her to take control and supervise her area effectively. She demands excellence from her employees and earns their respect by setting this example." On the other hand, Ewing reiterated the need for Mentch to improve her interpersonal communication skills, noting that Mentch "needs to keep her sense of authority in perspective. Dawn also needs to think first before speaking. At times she lets her emotions control a situation rather than her good sense." Overall, Ewing indicated that she was pleased with Mentch's growth as a supervisor. Moreover, although Ewing had given Mentch a "2," the second highest rating available, McInerney, the department head, enhanced Mentch's

overall rating to a "1.5" because he felt Mentch's performance warranted the higher rating.

Proffitt came to the bank in November 1993 as Senior Vice President. Mentch soon approached him to express her wish that she be given an opportunity to move into a management position under his regime. Fortuitously, in January 1994 Ewing moved to another department at ESB where she would no longer supervise Mentch. Apparently with little or no input from McInerney (see below) or Ewing, Proffitt named Mentch to the position of acting manager (as asserted by Mentch) or supervisor (the term preferred by ESB) of the loan processing department, where she took on Ewing's former responsibilities. The parties agree that Proffitt specifically advised Mentch that her new assignment would not be made permanent unless and until he was satisfied Mentch could "handle" the position. Consequently, because Mentch was merely given a probationary "try out," as it were, Proffitt would not discuss, and Mentch understood that she would not receive, a salary increase, although, since she would not be assigned to a permanent "exempt" position, she would continue to be paid overtime.

As the acting manager, Mentch supervised the entire loan processing department (apparently including more than 20 loan processors) and reported directly to McInerney. Mentch frequently inquired about her progress and overall performance as acting manager, and in April 1994, Mentch met with McInerney and Proffitt. McInerney drafted a memorandum to Mentch's "Personnel File" to memorialize the discussion at the meeting. By any reasonable measure, the memorandum could hardly be viewed as a positive assessment of Mentch's performance. The memorandum did describe as "commendable" Mentch's "commitment, dedication, job knowledge, take charge attitude and desire." The gravamen of the memorandum, however, was critical of Mentch's performance. It indicated that Mentch would not be appointed manager unless she improved her supervisory skills. Specifically, Mentch recently had reprimanded one of her loan processor-subordinates while co-workers were present, and

the incident gave McInerney great doubt as to Mentch's effectiveness and abilities. Although McInerney optimistically attributed some of Mentch's behavior to "overzealousness and inexperience," he also stated "I am concerned that her style of supervision may inhibit the development of her staff ... I am concerned that Dawn's staff may work out of fear and not from a sense of accomplishment and team work."

There is a significant (but immaterial) dispute between Mentch and McInerney as to whether Mentch was fit to succeed Ewing as manager of loan processing. Mentch asserts that in June 1994, several weeks after their meeting with Proffitt, which was summarized in the memorandum to file, McInerney gave her an oral evaluation over lunch, indicating that he was very proud of her, and that he was prepared to make Mentch the manager permanently but that Proffitt had to make the final decision. McInerney flatly denied these assertions, and indeed, he testified on deposition that he was opposed even to the "try out" for Mentch and that he so advised Proffitt at the time Ewing left the loan processing department for her new position. McInerney explained that he thought Ewing acted as a necessary counterweight to Mentch's aggressive style and thus, the two worked well in tandem with Mentch's small group of processors, but he did not believe Mentch could actually handle Ewing's job. For purposes of the summary judgment proceedings, this apparent dispute is not material since the parties do not disagree that only Proctor (primarily) and Proffitt (secondarily) were the decision-makers in respect to the ultimate decision to deny Mentch a promotion to manager and to remove her from the loan processing department altogether.

Defendant Proctor replaced McInerney in June and became Mentch's immediate supervisor. Proctor had interacted with Mentch in previous years; he believed Mentch to be a technically competent but confrontational employee. Unlike McInerney, Proctor was blunt and to the point: before he accepted Proffitt's offer to assume McInerney's former position as Assistant Vice President with responsibility for loan administration, he asked Proffitt to terminate Mentch. Proffitt

refused Proctor's request, and instead insisted that Mentch be given "a chance." Within one month, however, Proctor gave Mentch an "average" evaluation in a performance review, the lowest evaluation Mentch had ever been given in her four years at ESB. Proctor's concern with Mentch's communication skills was consistent with previous evaluations. Although during the summer Proctor commended Mentch (and her department) for achieving significant goals, he also indicated, however, that Mentch's work was often incomplete and/or inaccurate, and that Mentch had limited job knowledge and required help. Mentch had never before received these criticisms.

Ultimately, in late August 1994, Proctor, with Proffitt's approval, ended Mentch's "try out" in the loan processing department and EBS arranged for Mentch to take a position as a subordinate of McInerney. Proctor insists adamantly that he actually decided (with Proffitt's approval) to terminate Mentch's employment (rather than reassign her) well before she was actually transferred (and certainly, accordingly to Proctor, before he learned Mentch was pregnant). Indeed, ESB contends that the decision to terminate Mentch was changed to a decision to transfer her precisely because she announced her pregnancy, apparently, and ironically, out of fear of litigation her termination would likely entail, although they seem to assert that they merely wished to give her the benefit of the doubt. The loose manner in which ESB seemingly allowed such employment decisions to be made, communicated and executed, without adequate documentation, has deprived ESB of any conclusive proof of its assertions in these regards.

In any event, according to Mentch, the temporal context and the circumstances (as recounted by Mentch) surrounding her non-promotion/transfer are probative of discrimination on the basis of pregnancy. I shall set forth Mentch's version of events.

On August 9, 1994, Proctor asked Mentch to remain after a department meeting. Proctor commended Mentch on his perceived improvement in her performance and asked if she felt prepared to supervise an additional number of employees. The two also talked briefly about Mentch's plan to appoint group leaders, and Mentch inquired whether she could move into Ewing's old office. Mentch was pleased that Proctor noticed her improvement, and she informed Ewing, with whom she still communicated, about the positive feedback Proctor had given her. (Although Mentch vaguely suggests that Ewing would corroborate this alleged conversation, the deposition excerpt relied on for this vague suggestion does not support the inference that Ewing believed, from Mentch's statement to her, that Proctor believed that Mentch's performance had improved).[2]

Mentch learned she was pregnant on Friday, August 13 and on Monday, August 15, she informed Proctor and Proffitt that she was pregnant. Shortly thereafter, Proctor stopped including Mentch in meetings she normally attended. Later, Proctor informed Mentch that she would not be made manager and, indeed, that she would be transferred entirely from the loan processing department. Proctor stated that he needed a new style of management, and seemed to indicate that others would also be leaving the department. Mentch was transferred to one of McInerney's departments. Contrary to Proctor's implications, however, no other per-

2. Mentch relies upon the following exchange at page 25 of the transcript of Ewing's deposition:
A: Dawn came to me—I guess it would be in June [1994], and said that she was quite upset because she had received a poor review. Maybe July, it was from Rick Proctor. She was very upset.
Q: What advice did you give her?
A: At that point Rick had been in this management position for about 30 days, I guess. And I—more or less told Dawn, wait and see what happens after that. Maybe things would turn around for her, just to hang in there.

Q: To your knowledge, did they?
A: Dawn told me, I guess 30 days later, a month later, that—I don't know if it was an official review, but she had at least had a conversation with Rick, and said that things were looking much better.
Q: Now, was that her opinion, or was she quoting Rick?
Mentch did not provide page 26 of the transcript, and so the answer to her counsel's last question is not disclosed.

sonnel changes were made. In her new position, Mentch performed data entry for about one month, then became a special projects administrator. ESB did not lower Mentch's salary, but Mentch's new responsibilities did not require, and thus she was not paid, overtime. In Mentch's 1994 evaluation, McInerney rated Mentch as satisfactory. Because McInerney had supervised her work as acting manager before his transfer in June 1994, and because McInerney consulted with Proctor in completing the evaluation, Mentch contends that McInerney's 1994 evaluation is probative that she was performing satisfactorily as acting manager, despite the fact that her job at the time of the evaluation was not in the loan processing department.

Thus, the gist of Mentch's pregnancy discrimination claim is the assertion that she was performing her job as acting manager in the loan processing department satisfactorily, but she was denied a promotion and transferred after she announced her pregnancy. Mentch also relies upon anecdotal accounts from other employees of ESB—Kaye Douden [3], Karen White [4] and Ewing [5]—to support her claim of discrimination based on pregnancy.

On March 7, 1995, Mentch submitted a written request for the twelve weeks of maternity leave guaranteed by the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, and attached her physician's certification. ESB's leave of absence policy mirrors the Family and Medical Leave Act, and guarantees an employee on leave for up to three months that ESB will hold the employee's position or an equivalent position. Before her leave expired, Mentch decided she needed more time with her infant, and telephoned McInerney to inform him that she would be requesting an extended leave of absence. McInerney thanked her for calling and said, "I'll see you in September." Immediately thereafter, on May 29, 1995, Mentch submitted a written request for an extended leave of absence until August 31, 1995. In her letter, Mentch indicated that she understood "the company's policy regarding leave of absence." That policy provides that for employees absent between three and six months, ESB will make efforts to place the employee in an equivalent position. As Mary Atteberry, ESB's personnel manager, indicated in her written response to Mentch,

**3.** Douden had misgivings about how ESB treated its pregnant and post-maternity leave employees. When Douden returned from her maternity leave, a less senior employee whom Douden had trained had been elevated to a supervisory position for which Douden felt she was more qualified. Also, Douden had been warned that she would suffer a decrease in pay for taking too much time during work hours to pump breast milk for her infant. When Douden first returned from her leave, ESB had granted Douden two twenty-minute breaks per day to pump her milk. Several weeks later, Douden's supervisor had told McInerney that Douden appeared to be taking "long breaks to pump milk," and McInerney had informed Douden that her pay would be decreased. Douden had thereafter protested that cigarette smokers did not suffer pay reductions for taking numerous smoke breaks throughout the work day. Ultimately, Douden and McInerney reached an agreeable compromise.

**4.** White testified that she waited three months before informing her supervisor, Linda Cashman, that she was pregnant, because she feared she would jeopardize her job security. Mentch's transfer from a managerial position to an altogether different department troubled White. As White explained, Mentch "was in a management position, and that a short time after that, she notified her managers and so forth that when she

was pregnant, she was no longer a manager and not working in that department." White added, "[o]ther women there had been pregnant and, you know, that when they came back, that their position wasn't there...." White did not want her supervisor to question her "dedication" or her "intentions."

White also testified that her supervisor, Cashman, along with other employees, often made offensive comments. Cashman commented at a business meeting that "children were a disruption." Cashman and Debi Headley, one of White's co-workers, made various remarks about pregnant women's appearances and eating habits. Once, Cashman, Headley, and another employee used a computer scanner to superimpose a picture of another pregnant employee's face on a magazine clipping showing a pregnant woman modeling underwear. The group was "making fun" of the picture while White was not around, and when she returned, they told White "[t]his is what you look like."

**5.** According to Ewing, pregnant workers did have reason to believe that supervisors would question their commitment to work. Ewing testified that McInerney once instructed her not to count on post-maternity leave employees "one hundred percent" because their "minds would be on the baby; it would take them a while to get back into the work habit."

"[w]e cannot guarantee that a suitable position will be available." Mentch received this letter and understood its meaning.

Near the end of her extended leave, Mentch telephoned Atteberry to discuss the positions that would be available upon her return. Mentch did not qualify for three of the available positions, and she was not interested in taking the other two available positions, apparently because they paid less than her former salary. Mentch then inquired whether ESB was going to terminate her, and Atteberry informed her that the proper procedure was for Mentch to resign. Mentch felt that she should not have to resign and instead that ESB should terminate her. Eventually, Mentch went to ESB to resign and pick up her belongings, and on that occasion Atteberry offered to show Mentch the list of available positions that they had discussed over the phone. Mentch again concluded that she was either unqualified or uninterested in the positions, and consequently, on September 1, 1995, Mentch tendered her resignation. Mentch makes no claim in this case in respect to the actual termination of her employment.

### (iii)

■ Mentch has elected to cast her claim as one for discriminatory *termination* (from the acting manager position), and ESB has largely acquiesced in that characterization of the claim. ESB has also (and alternatively) characterized the claim as a discriminatory *transfer* and has sought to demonstrate that Mentch fails to project sufficient admissible evidence to sustain a claim for a discriminatory transfer, if the Court should conclude that the transfer constituted an adverse employment action. Even assuming that Mentch's transfer was an adverse employment action, I am satisfied, as indicated *supra* n. 1, that Mentch has failed to allege with any measure of clarity a claim that her *transfer* from the loan processing department, apart from her non-promotion, was effected

because she was pregnant. I also agree with ESB that Mentch has not produced evidence sufficient to generate a dispute of fact as to whether the decision to transfer her was made because she was pregnant. And certainly, the anecdotal evidence of others who allegedly experienced adverse treatment on account of pregnancy is not sufficient to salvage *Mentch's* claim under the circumstances of this case.[6] As indicated *supra*, ESB actually claims that the transfer was effected in lieu of a termination, although the litigation the bank apparently hoped to avoid has nevertheless been instituted. Whether or not that contention is valid, Mentch simply has not sought to assert a claim based on her transfer, and no further consideration need be given to the transfer.

■ Thus, I conclude that based on the facts established by the parties in the summary judgment record, Mentch's claim is properly viewed as a *failure to promote* claim. Mentch admits that her tenure as acting manager was an *experiment* undertaken solely by the newly-arrived Proffitt as a part of the evolution of his management team—it was, indeed, Proffitt's peculiar way of actually having Mentch *apply* for Ewing's job. (It cannot be overlooked that such closed practices—which create substantial barriers to employment opportunities to large groups of people—often give rise to legitimate claims of discrimination. Mentch seems to have been singled out for special treatment by Proffitt; there is no indication in the record that any other employee of ESB—and certainly not any non-employee member of the Baltimore metropolitan labor force—was given an opportunity to compete for the opening created by Ewing's reassignment. It cannot be surprising, therefore, if this was a standard operating procedure, that ESB—a large institution—not infrequently finds itself embroiled in this kind of litigation.) In any event, my analysis of the undisputed facts and my application of the

---

6. That testimony strongly attests to the bank's need to address in a serious way the corporate culture of intolerance that it seemingly has allowed to persist. As the victims of unlawful discrimination well know, the pain is not lessened when other victims or potential victims engage in behavior that is not welcome and

which is demeaning. Thus, the fact that women managers are alleged to have engaged in acts of intolerance does not make the behavior any less deplorable; what may strike some as good-natured horseplay should be understood as very likely cruel and insensitive to others.

law to the facts of this case differ somewhat from the approach taken by the parties.

■ At the core of Mentch's failure to promote claim is an allegation of disparate treatment on the basis of pregnancy. Mentch may prove her disparate treatment claim either through direct or circumstantial evidence. *Nilson v. Historic Inns Group,* 903 F.Supp. 905, 907 (D.Md.1995)(pregnancy discrimination claim); *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1314 (4th Cir.1993)(age discrimination claim). Mentch has attempted to establish her case under the familiar three-part scheme of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, Mentch must present evidence sufficient to establish a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. at 1824; *see also Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Mitchell,* 12 F.3d at 1315. In this Circuit, a plaintiff may establish a prima facie claim of discriminatory non-promotion by proving by a preponderance of the evidence that

1. [s]he is a member of a protected group;

2. [s]he applied for the position in question;

3. [s]he was qualified for the position; and

4. [s]he was rejected for the position in favor of someone not a member of the protected group, under circumstances giving rise to an inference of unlawful discrimination.

*Alvarado v. Board of Trustees,* 928 F.2d 118, 121 (4th Cir.1991)(adopting the district court's modified *McDonnell Douglas* test); *see also Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989).

■ If plaintiff establishes a prima facie case, then at the second step of the *McDonnell Douglas* proof scheme, ESB must undermine the inference of discrimination arising from the establishment of a prima facie case. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. That is, ESB must produce

evidence of its legitimate, nondiscriminatory reasons for the non-promotion. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Alvarado,* 928 F.2d at 121–22. While ESB "need not persuade the court that it was actually motivated by the proffered reasons," *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094, ESB must "clearly set forth ... the reasons for the plaintiff's rejection" and thereby raise a genuine factual dispute whether it discriminated against Mentch. *Id.* at 255, 101 S.Ct. at 1094–95.

■ Third, should ESB successfully carry its burden of production, the presumption of discrimination "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2748–50 (1993). To prevail, Mentch must "show that [the defendant's] stated reason ... [is] in fact pretext," and satisfy her ultimate burden of proving that discrimination was the true reason for the non-promotion. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Alvarado,* 928 F.2d at 121.

■ As a matter of law, Mentch has failed to establish a prima facie case of pregnancy discrimination because she cannot satisfy a critical requirement as to the fourth *Alvarado* factor. The dispositive fact in this case is the fact that the ultimate decision-maker here—Proctor—made it clear beyond a doubt and long before he learned of Mentch's pregnancy that he had no genuine intention of retaining Mentch as a part of his area of responsibility. Whatever else may have motivated Proctor's disdain for Mentch—and it appears largely to have been a bona fide disaffection for her on account of her lack of communication skills—it is clear as a matter of law that Mentch fell into disfavor with Proctor during his contact with her well before she became acting manager, and before he even became her supervisor.

Thus, even though I agree with Mentch that under circumstances different from those shown on this record, Proctor's negative evaluation of Mentch's performance after only 30 days as her supervisor would be entitled to little probative value for purposes of summary judgment, Proctor was not writing on a clean slate. Reasonable minds sim-

ply could not disagree that Proctor knew Mentch and had already formed the intent that she would not work for him. Pregnancy (or any other protected characteristic, so far as this record shows) was a non-issue with Proctor when it came to Mentch.

Under *Alvarado's* test for establishing a discriminatory failure to promote, Mentch has not come close to establishing that "[s]he was rejected for the position in favor of someone not a member of the protected group, *under circumstances giving rise to an inference of unlawful discrimination.*" Neither the anecdotal evidence of hostility towards pregnant employees nor the fact that a non-pregnant employee (a female) was given the manager's job is sufficient to alter this conclusion. The circumstances here establish that Proctor never wanted Mentch on his team, and worked affirmatively to remove her from his team—by trying to persuade Proffitt to end his "experiment"—even before he assumed responsibility for the loan processing department. No rational fact finder could reasonably conclude that it was Mentch's announcement that she was pregnant that motivated Proctor's decision not to promote Mentch. Accordingly, the failure to promote claim fails because Mentch has not established a prima facie case of pregnancy discrimination as to that claim. *Cf. Rosado v. Virginia Commonwealth University,* 927 F.Supp. 917, 931–37 (E.D.Va.1996) (applying *Alvarado's* fourth factor in context of university tenure decision).

■ Even if Mentch is deemed to have established a prima facie case of pregnancy-based failure to promote, however, the outcome would be the same. It is readily apparent that the fourth factor in the *Alvarado* analysis of the prima facie case of a failure to promote claim is closely analogous to the third step of the *McDonnell Douglas* shifting burdens scheme of proof, which focuses on the ultimate "straightforward" issue of whether "the plaintiff has successfully demonstrated that she was the victim of [pregnancy] discrimination on the part of the employer." *Burns v. AAF–McQuay, Inc.,* 96 F.3d 728, 732 (4th Cir.1996) (citations omitted) (age discrimination claim). Mentch justifiably argues that Proctor's contemporane-

ous explanation for her non-promotion—that it was his intent to make a series of changes in the loan processing department—constitutes "pretext" in the sense that it was transparently specious. Nevertheless, Proctor's and ESB's apparent effort—seemingly a recurring theme in the management philosophy at the bank—to "sugarcoat" bad news does not assist Mentch in marshaling sufficient evidence to defeat summary judgment on a claim of intentional discrimination under the circumstances of this case. Under my analysis of the facts in the light most favorable to Mentch, even if Mentch were deemed to have established a prima facie case of pregnancy discrimination in connection with her non-promotion, I am persuaded that at the third stage of the *McDonnell Douglas* analysis, reasonable minds could not disagree (despite the rampant optimism of McInerney and the euphemisms employed by Proctor in his face-to-face contact with Mentch), whether Proctor indeed had legitimate nondiscriminatory reasons—he did not think she was qualified—for denying her the promotion. Furthermore, as stated above, Mentch has generated no genuine dispute of material fact as to the falsity of Proctor's reasons for her non-promotion, or if false, that the true reason was pregnancy or some other protected characteristic.

At bottom, Mentch cannot generate a genuine dispute of material fact through reliance upon her own uncorroborated attribution of statements by Proctor and McInerney that she was performing satisfactorily, which they, respectively, vehemently deny they ever made, *cf.* n. 2, *supra,* or through a strained effort to show that Proffitt explained her non-promotion somewhat differently than did Proctor. Accordingly, summary judgment shall be granted as to any claim of intentional discrimination on the basis of pregnancy.

(iv)

■ ESB argues that there exists no cause of action for "pregnancy harassment." As a matter of syntax, ESB is correct. As a matter of law, however, extant judicial construction of Title VII exposes ESB's argument as flawed.

Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a)(1), prohibits an employer from failing or refusing "to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." This sweeping language illustrates Congress's intent to be "unconstrictive, knowing that constant change is the order of our day and that the seemingly reasonable practices of the present can easily become the injustices of the morrow." *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971) (opinion of Goldberg, J.), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). As evidence of this intent, when the Supreme Court upheld as nondiscriminatory an employee disability plan that excluded pregnancy-related disabilities, *General Elec. Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), Congress promptly amended Title VII through enactment of the Pregnancy Discrimination Act and clarified that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). A claim of pregnancy harassment fits logically under Title VII as amended. *See generally Los Angeles Dep't. of Water & Power v. Manhart*, 435 U.S. 702, 708 n. 13, 98 S.Ct. 1370, 1375 n. 13, 55 L.Ed.2d 657 (1978) (finding that by forbidding gender discrimination Congress intended to prohibit the "entire spectrum" of disparate treatment based on gender).

Behavior that impermissibly "differentiates a particular employee or group of employees on the basis of race, sex, religion, or national origin violates the equal 'conditions of employment' requirement of Title VII." *McKinney v. Dole*, 765 F.2d 1129, 1139 (D.C.Cir.1985); 42 U.S.C. § 2000e–2(a)(1). The Supreme Court readily recognized that harassment that would not occur but for the sex of an employee is such an example. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)("[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'dis-

criminate[s]' on the basis of sex."); *cf. Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir.1987) ("sexual harassment … is now universally recognized as employment discrimination within the meaning of Title VII."), *appeal after remand*, 928 F.2d 966 (10th Cir.1991); *Garber v. Saxon Business Products, Inc.*, 552 F.2d 1032 (4th Cir.1977) (finding that employers violate Title VII by permitting male supervisors to demand sexual favors from female employees).

To be sure, the phrase "sexual harassment" can be a misnomer. As several circuits have now recognized, the touchstone of an actionable Title VII sexual harassment claim is not whether the offensive conduct includes "sexual advances or … other incidents with clearly sexual overtones." *McKinney*, 765 F.2d at 1138; *Hicks*, 833 F.2d at 1415 (adopting *McKinney v. Dole*); *Hall v. Gus Construction Co., Inc.*, 842 F.2d 1010, 1014 (8th Cir.1988) (aligning its holding with *McKinney v. Dole* and noting that "[i]ntimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances"); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir.1990) (finding that impermissible discrimination is not necessarily comprised of sexual overtones and holding that it is only necessary to show that but for the plaintiff's gender she would have been treated differently). The critical inquiry "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring); *Tietgen v. Brown's Westminster Motors, Inc.*, 921 F.Supp. 1495, 1501 (E.D.Va.1996). Indeed, in an effort to distinguish this "nonsexual" harassment from harassment which is sexual or erotic in nature, the Northern District of Illinois refers to the former as "gender harassment." *See Cline v. Gen. Elec. Capital Auto Lease*, 757 F.Supp. 923, 931 (N.D.Ill.1991). Thus, I conclude that Title VII recognizes a claim for pregnancy harassment.

██ I need not determine whether Mentch can survive summary judgment as to such a

claim here, however, in light of ESB's argument that it should be granted summary judgment on Mentch's harassment claim because in her response brief Mentch did not specifically address ESB's harassment argument.[7] I agree with ESB that Mentch has abandoned her harassment claim by failing to address that claim in her opposition to ESB's motion for summary judgment, or to offer clarification in response to ESB's reply brief.

(v)

Mentch originally sued for breach of contract allegedly arising from ESB's failure to promote her to permanent manager and its failure to place her in her former position once she returned from maternity leave. She has abandoned the former claim and the second breach of contract claim lacks merit.

Mentch's claim is that ESB failed "to make an effort" to place her in an acceptable position upon her return. This claim fails factually and legally. Once Mentch requested an extended maternity leave, ESB was relieved of its obligation under federal law to return Mentch to her pre-maternity leave position. Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, 2612 & 2614. Mentch concedes that ESB's only remaining obligation, after she exceeded the prescribed leave, was to exert reasonable efforts to identify a position compatible with Mentch's skills. ESB made this limited obligation explicit to Mentch upon approving her extended leave, and Mentch understood and accepted the attendant risks.[8] Mentch's testimony that Mary Atteberry was "nonchalant" when she reviewed the available positions with Mentch does not, even viewed in the light most favorable to Mentch, raise a genuine dispute whether ESB made sincere efforts to find Mentch a suitable position. Atteberry reviewed the available positions with Mentch twice: when Mentch called to inform ESB she was ready to return, and when Mentch went to ESB to turn in her resignation letter. The result was that Mentch was either unqualified or uninterested in the available positions. Accordingly, summary judgment shall be granted as to both of Mentch's breach of contract claims.

(vi)

For the reasons discussed above, ESB's motion for summary judgment shall be granted.

---

7. The facts arguably supportive of Mentch's (now abandoned) hostile environment claim focus on Proffitt, although he denies much of her allegations. Proffitt would "waddle" behind Mentch as she walked, and he would simultaneously sing "weebles wobble but they don't fall down." Other employees witnessed Proffitt's behavior and mimicked Proffitt by instructing Mentch to "waddle back" to her desk. Mary Nowak testified that Proffitt made the "weebles wobble" comment on several occasions. Once Proffitt encountered Mentch and her mother in a department store and he yelled to Mentch, "there's nothing large enough in here for you." Profitt also referred to Mentch as "Tubs."

In general, Proffitt made comments whenever he saw Mentch eating, once remarking "oh, my God, she's eating again, can't keep anything laying around here." Proffitt would back up against the wall when Mentch passed, as if the hallway were not wide enough. Proffitt also referred to Mentch as "lard ass," and warned her that if she did not stop gaining weight, she would eventually look like the sister of a certain ESB employee who was estimated to weigh three hundred pounds.

Apparently, neither Mentch nor any other employee ever filed a complaint about the allegedly hostile environment at the bank in respect to pregnancy. *See supra* nn. 3–5, 6.

8. McInerney's response, "I'll see you in September," when Mentch informed him she would be extending her maternity leave, does not warrant a different result. These words certainly cannot be construed as a promise or a guarantee. Even if they could be so construed, Mentch admits she was familiar with ESB's policy that an employee shall rely only on ESB's written promises or guarantees.